# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 22-1013V

| | |
|---|---|
| CHRIS L. STROUT, *as personal representative of* ESTATE OF DIANE M. STROUT,<br><br>                Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>                Respondent. | Chief Special Master Corcoran<br><br>Filed: February 26, 2026 |

*Miriam A. Johnson, Berman & Simmons, P.A., Lewiston, ME, for Petitioner.*

*Benjamin Patrick Warder, U.S. Department of Justice, Washington, DC, for Respondent.*

**<u>DECISION ON ATTORNEY'S FEES AND COSTS</u>**[1]

On August 19, 2022, Chris L. Strout filed a Petition for compensation on behalf of his deceased mother, Diane M. Strout, under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges (under the Vaccine Act Table) that Ms. Strout suffered from Guillain-Barré syndrome ("GBS"), which led to her death, as a result of an influenza ("flu") vaccine she received on November 18, 2020. Pet. at 1-2. The case was activated and assigned to the "Special Processing Unit" (OSM's adjudicatory system for resolution of cases deemed likely to settle). ECF No. 8.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

Although the claim was unsuccessful, I find it possessed sufficient reasonable basis to permit an award of attorney's fees. But a small reduction in the amount of fees and costs to be awarded is appropriate, for the reason stated below.

## I.      Relevant Procedural History

Following a medical review of this case, Respondent filed his Rule 4(c) Report setting forth his objections to Petitioner's eligibility for compensation. ECF No. 20. Respondent argued that onset of Ms. Strout's GBS occurred *25 to 30 hours* post vaccination – therefore outside the Table's 3-42 day window. *Id.* at 11 (citing Ex. 1 at 282, 354, 474, 578, 584, 592; Ex. 2 at 42-43, 59). Respondent further argued that Petitioner had not offered an expert opinion to explain how Ms. Strout's GBS satisfied the timing requirements for a causation-in-fact claim. *Id.* at 13. And Respondent identified record evidence of competing causes for Ms. Strout's GBS. *Id.* (citing Ex. 2 at 76, 82, 235).

I thereafter issued an Order to Show Cause in response to the arguments made in Respondent's Rule 4(c) Report, noting that the filed record revealed that the onset of Ms. Strout's GBS likely occurred no later than November 20, 2020, thus two days post vaccination (and inconsistent with the Table timeframe). ECF No. 22 at 1 (citing Pet. at 2). Additionally, I noted evidence showing several possible alternate causes for Ms. Strout's GBS, as she was suffering from a urinary tract infection ("UTI")/sepsis and her cultures were positive for E.coli at the time she received the subject flu vaccination. *Id.* (citing Ex. 1 at 272-74, 282-83). I concluded by warning Petitioner that all such facts suggested dismissal was appropriate unless Petitioner could better substantiate the claim. *Id.* at 5. But I otherwise afforded Petitioner an opportunity to submit additional evidence showing that the onset of GBS could occur so soon after vaccination in the off-Table context, and while explaining the potential alternative factors at issue and evident from the record. *Id.*

In response, Petitioner filed a Motion to Voluntarily Dismiss his claim pursuant to Vaccine Rule 21(a). ECF No. 24. As requested, I issued a Decision dismissing Petitioner's claim on November 20, 2023. ECF No. 25. Judgment entered on December 27, 2023. ECF No. 27.

Petitioner subsequently filed a request for an award of $11,861.00 in attorney's fees and costs. Motion for Attorney's Fees and Costs, ECF No. 28. Petitioner's request is comprised of $10,604.40 in fees and $1,256.60 in costs. *Id.* at 3. Petitioner generally maintains that his claim was filed in good faith and with a reasonable basis. *Id.* at 1-2.

Respondent reacted to the Petitioner's request on June 16, 2024. Response, ECF No. 29. Although he failed to specifically elaborate on the presence of good faith and

reasonable basis, he stated that he "is satisfied the statutory requirements for an award of attorneys' fees and costs are met in this case." *Id.* at 2. Respondent asks that I "exercise [my] discretion and determine a reasonable award for attorney's fees and costs." *Id.* at 3. And Petitioner did not file a reply thereafter.

## II.    Abbreviated Factual Synopsis

Ms. Strout's pre-vaccination history is relevant for *uncontrolled* diabetes mellitus type 2 and severe diabetic peripheral neuropathy. *See,* e.g., Ex. 1 at 51, 211; Ex. 5 at 21. Ms. Strout was taking gabapentin for neuropathic pain as early as 2017. Ex. 3 at 39; Ex. 4 at 126, 152; Ex. 5 at 60. She also reported bladder and bowel incontinence and reduced bilateral extremity control in November of 2017. Ex. 4 at 117-23; Ex. 5 at 52. Ms. Strout experienced other neuropathic symptoms attributed to her diabetes, such as numbness and tingling in the extremities, throughout 2018 and 2019. Ex. 7 at 24-26, 65-66, 71-74, 93-94, 98, 104-05. By September 2019, Ms. Strout was taking Lyrica, gabapentin, and Cymbalta for her peripheral neuropathy and was ambulating with a wheelchair and/or walker. *See,* e.g., Ex. 1 at 589; Ex. 4 at 41, 44. Ms. Strout experienced dysphagia and vomiting in October 2019. Ex. 1 at 94. In January 2020, Ms. Strout required the assistance of home health aides. Ex. 4 at 12. She complained of ongoing bowel issues in April 2020 and was subsequently diagnosed with irritable bowel syndrome ("IBS"). Ex. 3 at 8-9. Ms. Strout complained of worsening gastrointestinal issues, including increased diarrhea, constipation, and vomiting by October 20, 2020. *Id.* at 32.

The record specifically reveals treatment Ms. Strout received immediately prior to the vaccination at issue that is relevant to the claim. On November 14, 2020 (four days pre vaccination), Ms. Strout was taken to the emergency room ("ER") via ambulance for a two-day history of general malaise, nausea and vomiting, abdominal pain, lower back pain, headache, and numbness in her hands and feet. Ex. 1 at 196. She had a fever of 101.3, received IV fluids and Tylenol, and was discharged home. *Id.* at 219-20, 311.

The next day (November 15, 2020), Ms. Strout was again transported to the ER via ambulance complaining of lower back pain, lower abdomen tenderness, pelvic pain, weakness in her upper extremities ("UEs"), extreme weakness in her bilateral lower extremities ("LEs"), and an "altered mental status caused by UTI." Ex. 1 at 305. When she arrived, she complained of a continued headache and fever (feeling hot and cold for 2-3 days), as well as UTI symptoms. *Id.* at 311. Laboratory work revealed an abnormal urinalysis, low white blood cell count, elevated glucose and liver function, and was also positive for E.coli bacteria. *Id.* at 272-74, 281-82, 320, 470-71. Ms. Strout was diagnosed with a "UTI with sepsis suspect pyelonephritis" (kidney infection) and she was admitted. *Id.* at 323. While admitted, on November 18, 2020, at 1:43pm, Ms. Strout received the flu vaccine at issue. *Id.* at 474.

By November 19, 2020 (one day post vaccination), Ms. Strout could transfer from sitting to standing with supervision, but was non-ambulatory. Ex. 1 at 366. She reported improvement and the plan was for her to be discharged the following day. *Id.* But she subsequently worsened. *See id.* The next day, on November 20, 2020, rather than being discharged, at 3:12pm, Ms. Strout reported she now could not sit or stand due to weakness, which she attributed to a change in her antibiotic. *See* Ex. 1 at 283, 291, 354; *see also* Pet. ¶ 5. She was subsequently evaluated by physical therapy ("PT"). Ex. 1 at 354. Ms. Strout's physical examination did not show any objective neurological change and/or change in muscle strength, and she was ultimately discharged. *Id.* at 282-83.

That evening, however, at 7:43pm, Ms. Strout called EMS to her home due to her inability to ambulate. Ex. 1 at 578. Upon arrival at the ER, Ms. Strout reported that "around 4-5pm *yesterday* [November 19, 2020,] she began having 4 extremity weakness as well as some pins/needles in the bilateral hands up to the wrist." *Id.* at 583 (emphasis added). Ms. Strout noted that the weakness was worse in her LEs. *Id.* at 584. Upon examination, Ms. Strout had back pain on palpation, reduced bilateral UE strength, and weak grip strength. *Id.* at 589. She could not hold onto the bedrails, pull herself to an upright position, or lift her LEs off the bed; she was "essentially areflexic in all 4 limbs." *Id.* at 589-90. By 11:36pm on November 20, 2020, Ms. Strout was transferred to another facility due to a need for a higher level of neurologic care. *Id.* at 592.

In the early hours of November 21, 2020, Ms. Strout was seen in the ER of the higher-level care facility with a complaint of "worsening bilateral arm and leg weakness causing [an] inability to care for [her]self." Ex. 2 at 58. She identified the onset of this worsening in different ways. She "initially reported that soon after" she was discharged on November 20, 2020, she "developed worsening in her weakness in her [LEs], [and] *new* weakness in her [UEs]." *Id.* at 59 (emphasis added). "However, when [the ER physician] talked [to] her about the symptoms, [Ms. Strout] note[d that] they were gradually worsening over several days leading up to this" (therefore prior to November 20, 2020). *Id.* The ER physician further noted that visit notes from Ms. Strout's prior hospitalization indicate she "complained of weakness starting approximately 1600 [hours (4:00pm)] yesterday[,]" (on November 20, 2020), but that Ms. Strout herself now reported "onset of bilateral [UE and LE] weakness on the 19th, while admitted" with *worsening* "after discharge" (on November 20, 2020). *Id.* at 42. The physician noted it is "difficult to pinpoint timing[.]" *Id.* at 59. Ms. Strout's examination was concerning for "presumed GBS[.]" *Id.* at 47. By November 22, 2020, Ms. Strout had been moved to the ICU, was intubated, and had received her first dose of IVIG. *See,* e.g., *id.* at 32-33, 245, 248-50.

On November 23, 2020, Ms. Strout's treaters discussed her condition and indicated that her "severe case of [acute inflammatory polyneuropathy]/GBS – autoimmune [disease is] caused by infections more often than vaccines." Ex. 2 at 78. Ms.

Strout's treater felt that her GBS was "an auto-inflammatory response which may be due to her recent UTI and bacteremia, or may be a response to her recent influenza vaccination." *Id.* at 237. The neurologist opined that Ms. Strout's GBS was "statistically more probable to result from an active infectious process compared to immunization, [] both are potential sources." *Id.* Further IVIG was recommended, and on November 24, 2020, Ms. Strout had a tracheostomy placed due to worsening weakness associated with her GBS. *Id.*

Ms. Strout continued to receive treatment with varying responses through mid-December 2020. *See,* e.g., Ex. 2 at 65, 92-100, 105-06, 153-54, 207-08, 252-53. On December 13, 2020, Ms. Strout's tracheostomy dislodged, and her treaters tried unsuccessfully to resuscitate her; she passed away that day. *Id.* at 91, 286. The discharge summary reveals that Ms. Strout's GBS "may have been [an] auto-inflammatory response due to her recent UTI and bacteremia . . . or may have represented a reaction to her recent influenza vaccine." *Id.* at 29. Ms. Strout's cause-of-death was listed as "complications from [GBS]." *Id.* at 30.

### III.   Reasonable Basis

#### A.   Legal Standard

Motivated by a desire to ensure that petitioners have adequate assistance from counsel when pursuing their claims, Congress determined that attorney's fees and costs may be awarded even in unsuccessful claims. H.R. REP. NO. 99-908, at 22 *reprinted in* 1986 U.S.C.C.A.N. 6344, 6363; *see also Sebelius v. Cloer*, 133 S.Ct. 1886, 1895 (2013) (discussing this goal when determining that attorneys' fees and costs may be awarded even when the petition was untimely filed). This is consistent with the fact that "the Vaccine Program employs a liberal fee-shifting scheme." *Davis v. Sec'y of Health & Hum. Servs.*, 105 Fed. Cl. 627, 634 (2012). Indeed, it may be the only federal fee-shifting statute that permits *unsuccessful* litigants to recover fees and costs.

However, Congress did not intend that *every* losing petition be automatically entitled to attorney's fees. *Perreira v. Sec'y of Health & Hum. Servs.*, 33 F.3d 1375, 1377 (Fed. Cir. 1994). And there is also a prerequisite to even obtaining fees in an unsuccessful case. The special master or court may award attorney's fees and costs to an unsuccessful claimant only if "the petition was brought in good faith and there was a reasonable basis for the claim for which the petition was brought." Section 15(e)(1). Reasonable basis is a prerequisite to a fee award for unsuccessful cases – but establishing it does not automatically *require* an award, as special masters are still empowered by the Act to deny or limit fees. *James-Cornelius on behalf of E. J. v. Sec'y of Health & Hum. Servs.*, 984

F.3d 1374, 1379 (Fed. Cir. 2021) ("even when these two requirements are satisfied, a special master retains discretion to grant or deny attorneys' fees").

As the Federal Circuit has explained, whether a discretionary fees award is appropriate involves two distinct inquiries, but only reasonable basis is at issue herein.[3] Reasonable basis is deemed "an objective test, satisfied through objective evidence." *Cottingham v. Sec'y of Health & Hum. Servs*., 971 F.3d 1337, 1344 (Fed. Cir. 2020) ("Cottingham I"). The reasonable basis requirement examines "not at the likelihood of success [of a claim] but more to the feasibility of the claim." *Turner v. Sec'y of Health & Hum. Servs*., No. 99-0544V, 2007 WL 4410030, at *5-6 (Fed. Cl. Spec. Mstr. Nov. 30, 2007) (quoting *Di Roma v. Sec'y of Health & Hum. Servs.,* No. 90-3277V, 1993 WL 496981, at *1 (Fed. Cl. Spec. Mstr. Nov. 18, 1993)). The Federal Circuit recently explained "that a reasonable basis analysis is limited to objective evidence, and that subjective considerations, such as counsel's subjective views on the adequacy of a complaint, do not factor into a reasonable basis determination." *James-Cornelius*, 984 F.3d at 1379.

Although clearly easier to meet than the preponderant standard required for compensation, "courts have struggled with the nature and quantum of evidence necessary to establish a reasonable basis." *Wirtshafter v. Sec'y of Health & Hum. Servs.,* 155 Fed. Cl. 665, 671 (Fed. Cl. 2021). "[I]t is generally accepted that 'a petitioner must furnish some evidence in support of the claim.'" *Id.* Citing the *prima facie* elements of a successful claim described in Section 11(c)(1), the Federal Circuit recently instructed that the level of the objective evidence sufficient for a special master to find reasonable basis should be "more than a mere scintilla but less than a preponderance of proof." *Cottingham I*, 971 F.3d at 1345-46. "This formulation does not appear to define reasonable basis so much as set its outer bounds." *Cottingham v. Sec'y of Health & Hum. Servs.,* 159 Fed. Cl. 328, 333, (Fed. Cl. 2022) (*"Cottingham II")*, *aff'd without op.*, 2023 WL 754047 (Fed. Cir. Nov. 14, 2023). "[T]he Federal Circuit's statement that a special master 'could' find reasonable basis based upon more than a mere scintilla does not mandate such a finding." *Cottingham II*, 159 Fed. Cl. at 333 (citing *Cottingham I*, 971 F.3d at 1346).

Furthermore, the issue of reasonable basis is not a static inquiry. The reasonable basis which existed when a claim was filed may cease to exist as further evidence is presented. *Perreira*, 33 F.3d at 1377. In *Perreira,* the Federal Circuit affirmed a special master's determination that reasonable basis was lost after Petitioner's "expert opinion,

[3] Claimants must also establish that the petition was brought in good faith. *Simmons v. Sec'y of Health & Hum. Servs*., 875 F.3d 632, 635 (Fed. Cir. 2017) (quoting *Chuisano v. Sec'y of Health & Hum. Servs*., 116 Fed. Cl. 276, 289 (2014)). "[T]he 'good faith' requirement . . . focuses upon whether petitioner honestly believed he had a legitimate claim for compensation." *Turner v. Sec'y of Health & Hum. Servs*., No. 99-0544V, 2007 WL 4410030, at *5 (Fed. Cl. Spec. Mstr. Nov. 30, 2007). But good faith is not disputed herein, and I do not ascertain evidence in the record calling it into question.

which formed the basis of the claim, was found to be unsupported by either medical literature or studies." *Id.* at 1376.

For a GBS Table injury, onset must occur within three to 42-days post-vaccination. 42 C.F.R. § 100.3(a)XIV(D) (2017). For a non-Table injury, "a showing of a proximate temporal relationship between vaccination and injury" is required to meet the third *Althen* prong. *Althen v. Sec'y of Health & Hum. Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005) (setting forth the three-pronged test for causation). As I have previously noted, for an off-Table claim alleging a close-in-time onset, petitioners would need to establish that GBS due to vaccination could manifest in a lesser timeframe than the Table's three-day window. I and other special masters have denied entitlement when onset of GBS was so sudden. *See,* e.g., *Rowan v. Sec'y of Health & Hum. Servs.,* No. 17-760V, 2020 WL 2954954, at *16-19 (Fed. Cl. Spec. Mstr. Apr. 28, 2020) (finding a GBS onset sooner than three days post vaccination was not scientifically or medically supported by the record, given that GBS is known to be mediated by antibodies produced via the adaptive immune system, and this process takes longer than 3 days to result in symptoms); *Orton v. Sec'y of Health & Hum. Servs.*, No. 13-631V, 2015 WL 1275459, at *3-4 (Fed. Cl. Spec. Mstr. Feb. 23, 2015) (finding a 1-day onset of GBS following a flu vaccination was not substantiated by the evidence).

Petitioners who have been successful in establishing such a short onset marshalled other persuasive evidence to overcome this problem – though only in a few cases has this been successfully accomplished. *See,* e.g., *Lehrman v. Sec'y of Health & Hum. Servs.*, No. 13-901V, 2018 WL 1788477, at *14-19 (Fed. Cl. Spec. Mstr. Mar. 19, 2018) (finding entitlement for a petitioner who established a pre-vaccination history of an upper respiratory infection, which, *in combination with the flu vaccination,* was found to have resulted in an upregulation of the petitioner's immune system that led to a rapid onset of GBS and thus a 1-day onset was appropriate).

## B.    Existence of Reasonable Basis

Although not directly contested by Respondent, this claim was ultimately unsuccessful, so a reasonable basis showing must be made. As the prior records establish (and Petitioner himself alleges, Pet. at 2), the onset of Ms. Strout's GBS most likely occurred at some time between November 19-20, 2020, *at the latest.* That timeframe (two days post vaccination) falls outside the Table's 3-42 day window for onset of GBS following a flu vaccine. Thus, Petitioner's Table claim was objectively untenable from the outset for failure to meet this element. *Upton v. Sec'y of Health & Hum. Servs.*, No. 18-1783V, 2020 WL 6146058, at *2-3 (Fed. Cl. Spec. Mstr. Sept. 24, 2020) (finding the petitioner did not establish the onset of his GBS within the 3-42 day timeframe prescribed and thus did not establish a Table injury).

An onset that occurred two days post vaccination (at most) also makes a causation-in-fact claim unlikely to succeed. *See Rowan*, 2020 WL 2954954, at \*16-19. However, the close-in-time onset of Ms. Strout's post-vaccination GBS also occurred within one day of her *diagnosis with and treatment for* a UTI/sepsis and/or kidney infection. Ex. 1 at 323. As I explained in my Order to Show Cause (ECF No. 22), and what is understood generally in the Program, is that the presence of a preceding infection at the time of vaccination *could* produce the circumstances necessary to trigger the upregulation of an immune response, capable of producing such a rapid onset. In such limited circumstances, a special master might conclude that a vaccination could still play a role in causing GBS. *See Lehrman*, 2018 WL 1788477, at \*14-19.

The record also contains more than a mere scintilla of evidence showing that the subject flu vaccine could have been responsible for Ms. Strout's GBS. For instance, by November 23, 2020 – thus five days after vaccination – Ms. Strout's treaters informed her that her condition could be "due to her recent UTI and bacteremia, or may be a response to her recent influenza vaccination[,]" *and* that although GBS is "more probable to result from an active infectious process compared to immunization, [] *both are potential sources*." Ex. 2 at 78, 235-37 (emphasis added). Additionally, the discharge summary provided for Ms. Strout on December 13, 2020, states that her GBS "may have been [an] auto-inflammatory response due to her recent UTI and bacteremia . . . or may have represented a reaction to her recent influenza vaccine." Ex. 2 at 29.

This evidence provides sufficient support for a showing of reasonable basis. And there is no other basis for a denial of fees. Therefore, the only remaining question is the appropriate amount of the attorney's fees and costs to be awarded.

## IV.    Appropriate Amount to be Awarded

### A.    Legal Standard

Counsel must submit fee requests that include contemporaneous and specific billing records indicating the service performed, the number of hours expended on the service, and the name of the person performing the service. *See Savin v. Sec'y of Health & Hum. Servs.*, 85 Fed. Cl. 313, 316-18 (2008). Counsel should not include in their fee requests hours that are "excessive, redundant, or otherwise unnecessary." *Saxton v. Sec'y of Health & Hum. Servs.*, 3 F.3d 1517, 1521 (Fed. Cir. 1993) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)). It is "well within the special master's discretion to reduce the hours to a number that, in [her] experience and judgment, [is] reasonable for the work done." *Id.* at 1522. Furthermore, the special master may reduce a fee request *sua sponte*, apart from objections raised by respondent and without providing a petitioner notice and opportunity to respond. *See Sabella v. Sec'y of Health & Hum. Servs.*, 86 Fed.

Cl. 201, 209 (2009). A special master need not engage in a line-by-line analysis of petitioner's fee application when reducing fees. *Broekelschen v. Sec'y of Health & Hum. Servs.*, 102 Fed. Cl. 719, 729 (2011).

### B.    Attorney's Fees and Costs

The billing records reveal Petitioner is requesting fees calculated using hourly rates previously approved for all attorneys and paralegals who performed work in this case. *See,* e.g., *Lyons v. Sec'y of Health & Hum. Servs.,* No. 23-497V, 2024 WL 4603210 (Fed. Cl. Spec. Mstr. Sept. 27, 2024); ECF No. 28-4. And counsel provided supporting documentation for all claimed costs, which will thus be reimbursed in full. ECF No. 28-3.

However, I find a small reduction regarding the number of hours to be reimbursed is warranted. The billing records reveal Petitioner is seeking reimbursement for hours spent performing some administrative or secretarial duties, though at a paralegal rate. For instance, on two occasions Petitioner charged for activities such as filing the Petition itself (as well as for filing an exhibit list and amended statement of completion) and for Bates stamping medical records exhibits. ECF No. 28-4 at 1-2. Such tasks are akin to clerical or administrative duties. It is well established that billing for clerical and other secretarial work is not permitted in the Vaccine Program, regardless of the individual performing the task. *Rochester v. United States,* 18 Cl. Ct. 379, 387 (1989) (denying an award of fees for time billed by a secretary and finding that "[these] services . . . should be considered as normal overhead office costs included within the attorneys' fee rates"). **This results in a reduction of $240.00.[4]**

### Conclusion

I have determined that an award of reasonable attorney's fees and costs is appropriate in this case even though compensation was not awarded. Section 15(e)(1). Accordingly, I hereby **GRANT** Petitioner's Motion for attorney's fees and costs and award a total of **$11,621.00 (representing $10,364.40 in fees and $1,256.60 in costs) to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement.** The Clerk of the Court is directed to enter judgment in accordance with this Decision.[5]

**IT IS SO ORDERED.**

---

[4] This amount is calculated as follows: a reduction of $90.00 for the .60 hours spent filing the Petition on 8/19/2022 + a reduction of $150.00 for the 1.0 hour spent Bates stamping and filing on 3/2/2023 = $240.00.

[5] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master